IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT D. STRAUS, JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-4625 |
| | § | |
| DVC WORLDWIDE, INC., d/b/a DVC, | § | |
| and SMITHKLINE BEECHAM CORP., | § | |
| d/b/a GLAXOSMITHKLINE, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM, OPINION, AND ORDER
SETTING SCHEDULING CONFERENCE**

This case involves a 1989 photograph of the well-known golfer, Arnold Palmer. The

plaintiff, Robert Straus, Jr., a professional photographer, took the picture and copyrighted it.

He sues DVC Worldwide, Inc. ("DVC") and Glaxosmithkline ("GSK"), alleging that they

infringed the copyright by using the photograph—or images substantially similar to it—in

a smoking-cessation campaign in 2001 and 2002, beyond the license Straus had agreed to.

GSK sells smoking-cessation products, including NICORETTE and NICODERM. In

2001, GSK hired DVC as the promotional marketing agency for the 2002 campaign. In the

fall of 2001, GSK entered into an agreement with Arnold Palmer for him to serve as the

campaign spokesperson. Straus alleges that DVC and GSK improperly used the copyrighted

1989 photograph he took of Arnold Palmer. Straus makes four allegations of infringement:

1.      GSK used a modified 1995 photograph of Palmer taken by a different photographer in some marketing materials. Straus alleges that this photograph, as modified, is substantially similar to, and infringes, his copyrighted 1989 photograph.

2.      GSK and Straus entered into a license agreement for GSK to use the 1989 photograph of Arnold Palmer in advertising materials for its smoking-cessation products. The license agreement expired in February 2002. Straus alleges that advertising materials using the photograph remained in one drugstore in Houston for one month after the license agreement expired.

3.      GSK used a computer-generated version of Straus's 1989 photograph in a television advertisement aired in late December 2001 and January 2002 (and once in March 2002), outside the license agreement with Straus.

4.      DVC had a website on which it posted some of its advertising materials to show potential clients examples of its work. DVC posted one advertisement that included Straus's 1989 photograph of Arnold Palmer.

The defendants have filed a number of motions for partial summary judgment, addressing each of the four alleged infringements and Straus's damages claims. Straus has moved for partial summary judgment on two affirmative defenses. Both sides also seek to exclude certain evidence from the record. The following motions, responses, and replies are addressed in this memorandum and opinion:

- The defendants seek partial summary judgment on Straus's claim that the modified 1995 photograph of Arnold Palmer is an infringing derivative work of Straus's copyrighted 1989 photograph. (Docket Entry No. 25). Straus has responded, (Docket Entry No. 29), the defendants have replied, (Docket Entry No. 30), Straus has surreplied, (Docket Entry No. 33), and the defendants have responded to Straus's surreply, (Docket Entry No. 45). The defendants' motion for partial summary judgment is granted.

- The defendants move to strike the report of Straus's expert, Jane Kinne. (Docket Entry No. 30). Straus has responded, (Docket Entry No. 31), and the defendants have replied, (Docket Entry No. 32). The defendants' motion to strike is denied.

- Straus moves to exclude the testimony of the defendants' damages expert, Karyl M. Van Tassel, and of the attorneys' fees experts. (Docket Entry No. 34). The defendants have responded, (Docket Entry No. 47). The plaintiff's motion to exclude is denied.

- Straus moves to compel the production of various categories of documents, (Docket Entry No. 35), and the defendants have responded, (Docket Entry No. 46). This motion is denied as moot.

- GSK seeks summary judgment on Straus's claim for indirect profits damages. (Docket Entry No. 36). Straus has responded, (Docket Entry

3

No. 49), and GSK has replied, (Docket Entry No. 54).  The motion is granted.

• DVC seeks partial summary judgment as to Straus's claim that DVC infringed his 1989 copyrighted photograph of Palmer by including an advertisement using this photograph in the materials displayed on the company's website.  (Docket Entry No. 37).  Straus has responded, (Docket Entry No. 49), and DVC has replied, (Docket Entry No. 57).  DVC's motion for partial summary judgment is denied.

• The defendants seek partial summary judgment as to Straus's claim that he may recover actual damages multiplied by ten.  (Docket Entry No. 38).  Straus has responded, (Docket Entry No. 49), and the defendants have replied, (Docket Entry No. 53).  The defendants' motion is granted.

• The defendants seek partial summary judgment dismissing Straus's claims of infringement based on the advertisements that were left in the Houston drugstore in March 2002 and the "snippet" used in the television advertisement shown from late December 2001 to early 2002, on the basis of the *de minimis* doctrine.  (Docket Entry No. 39).  Straus has responded, (Docket Entry No. 49), and the defendants have replied, (Docket Entry No. 52).  The motion is granted.

4

- DVC seeks partial summary judgment dismissing Straus's claim for indirect profits damages. (Docket Entry No. 40). Straus has responded, (Docket Entry No. 49), and DVC has replied, (Docket Entry No. 56). DVC's motion is granted.

- Straus moves for partial summary judgment dismissing the defendants' affirmative defenses of laches and equitable estoppel. (Docket Entry No. 41). The defendants have responded. (Docket Entry No. 48). The motion is denied as moot.

These rulings are based on a careful review of the motions; the responses, replies, and surreplies; the pleadings; the parties' submissions; and the applicable law. The reasons for these decisions are set out in detail below. A status conference is set for April 12, 2007, at 9:00 a.m., to set a schedule to resolve the remaining claim.

## I.    Background

Robert Straus, Jr. is a photographer. In 1989, Straus took a series of photographs of Arnold Palmer, a professional golfer. On January 2, 1997, Straus registered one of these photographs with the Register of Copyrights as an unpublished work. (Docket Entry No. 29, Ex. A-10). On June 30, 1999, Straus again registered the 1989 photograph, this time as a published work, based on its inclusion in the book, *Arnold Palmer: A Personal Journey*. (Docket Entry No. 29, Ex. A-11). Over time, Straus agreed to several licenses for the use of his 1989 photograph of Palmer. Straus has licensed its use on magazine covers, in books,

on posters, in advertisements, and in artists' renderings of Palmer.  (Docket Entry No. 29, Exs. A-1–A-10).

The 1989 Straus photograph is a portrait of Palmer seated outside, wearing a dark, long-sleeved rugby shirt with a white collar and placket (the material below the collar which holds its front buttons in place).  A black-and-white copy of Straus's copyrighted 1989 photograph is attached as Appendix A to this memorandum and opinion.

In late 2001, GSK and Arnold Palmer entered into an agreement to have Palmer serve as the spokesperson for GSK's smoking-cessation program and products.  GSK's marketing agent, Catalyst Marketing, had little time to prepare the advertising materials scheduled for release in November 2001.  (Docket Entry No. 25, Ex. O, ¶ 3).  On September 28, 2001, Catalyst Marketing and Straus entered into a licensing agreement for the use of Straus's 1989 photograph of Palmer in GSK's advertisements for its smoking-cessation products during November and December 2001 and January 2002.  The agreement stated that for a $17,566.26 fee, Straus licensed the use of the 1989 photograph for 20,000 in-store displays during the month of January 2002; 25,000 "shelftalks" during November and December 2001; and 25,000 "shelftakes" during those same months.[1]  (Docket Entry No. 29, Ex. A-12). The agreement stated that Straus's work was not to be considered "work for hire" and that Straus reserved all other rights in the photograph.  (*Id.*).

_____

[1]  "Shelftalks" and "shelftakes" refer to in-store advertising materials.  (Docket Entry No. 29 at 4 n.22).

6

Shortly after the GSK advertising campaign began, GSK began using DVC as its marketing agent rather than Catalyst Marketing.  (Docket Entry No. 25, Ex. O, ¶ 4).  DVC recommended that GSK use a more recent picture of Arnold Palmer in its advertisements. While searching for a more recent photograph, DVC negotiated an extension of Straus's licensing agreement.  The extension provided for GSK's use of Straus's 1989 photograph for 25,000 shelftalks and 25,000 shelftakes for January and February 2002, for a $9,000 fee. (Docket Entry No. 29, Ex. A-14).

On December 19, 2001, DVC informed Straus that it had obtained other photographs of Palmer and would not extend the license agreement.  (Docket Entry No. 29, Ex. A-15). According to an internal DVC email, Straus's proposed estimate for the continued use of his 1989 copyrighted photograph was higher than DVC found acceptable.  (Docket Entry No. 29, Ex. B-5).

### A.    The Claim Based on the Modified 1995 Hauser Photograph

In 2001, DVC obtained permission to use a photograph of Palmer taken in 1995 by a photographer named Marc Hauser in the GSK advertising campaign.  Arnold Palmer Enterprises owned the copyright to this photograph and permitted its full use by DVC and GSK in marketing the smoking-cessation materials and products.  Hauser's 1995 photograph is a portrait of Palmer, seated indoors, wearing a bright blue, short-sleeved golf shirt with a small umbrella-shaped lapel pin on his left collar.  A black-and-white reprint of Hauser's 1995 photograph appears at Appendix B.

GSK's corporate representative, Steve Kapur, stated in his declaration that GSK used Hauser's 1995 photograph in marketing materials but quickly realized it required some adjustments. (Docket Entry No. 25, Ex. O, ¶ 7). Kapur stated that the bright blue color of Palmer's shirt appeared in varying shades of blue and green when reproduced, depending on the medium on which it was printed. In late 2001, GSK's art department modified Hauser's 1995 photograph by darkening the color of Palmer's shirt, lightening his collar and placket, removing the umbrella-shaped pin, and smoothing the colors of Palmer's skin tones. (*Id.*, ¶¶ 8, 9). In his declaration, Kapur stated that the changes GSK made to the 1995 Hauser photograph had nothing to do with Straus's 1989 photograph. (Docket Entry No. 24, Ex. O, ¶ 10). According to Kapur, GSK darkened the shirt to allow the photograph to be used against a variety of background colors. GSK lightened the color of the shirt's collar to provide better contrast between Palmer's face and the dark shirt. (*Id.*, ¶ 8). Kapur stated that the modified photograph "is a more subdued color [than the 1995 Hauser photograph] . . . allow[ing] people's eyes to see the head lines, to see Mr. Palmer's face . . . and it also allows the color of our packages to grab their eye as opposed to fighting with a bright blue shirt." (*Id.*, ¶ 12). GSK used the modified 1995 Hauser photograph in advertising materials through August 2002. (Docket Entry No. 29, Ex. B-9). A black-and-white reprint of the modified 1995 Hauser photograph appears at Appendix C.

Straus claims that the modified 1995 Hauser photograph infringes on his 1989 photograph. In response to the defendants' motion for partial summary judgment, Straus clarified that he does not claim that the original 1995 Hauser photograph infringed on his

1989 photograph.  Rather, Straus alleges that GSK's modifications to Hauser's photograph in 2001 made that photograph substantially similar to his 1989 photograph so as to infringe. (Docket Entry No. 29, Ex. A at 3).  "Both photographs are portraits of Arnold Palmer where his head is tilted and his shoulders are hunched in a similar manner.  In both he is smiling and his eyes, while squinting in both photographs, are engaged with the camera.  In both photographs Arnold Palmer is wearing a dark shirt with a white collar." (*Id.*).  Straus alleges that in his experience, Palmer is almost always photographed with the umbrella-shaped pin on his left collar, but that in the 1989 Straus photograph and the modified 1995 Hauser photograph, no umbrella-shaped pin appears.  Straus contends that "each alteration of the Hauser image was designed to make the manipulated image more resemble the Straus image."  (Docket Entry No. 29, Ex. A at 4).

The defendants have moved for summary judgment on this infringement claim, arguing that the modified 1995 Hauser photograph is, as a matter of law, not substantially similar to Straus's 1989 photograph and is not an infringing use.  (Docket Entry No. 24). Straus argues that, as a matter of law, the two photographs are substantially similar.  He seeks partial summary judgment that the modified 1995 Hauser photograph infringed his 1989 photograph.  (Docket Entry No. 29 at 11).

DVC also arranged for a series of new Palmer photographs for use in GSK's marketing materials.  (Docket Entry No. 25, Ex. N, ¶ 8).  Photographers Gary Kufner and Allan Hunter Shoemake created the new photographs of Palmer.  These photographs as well as the modified 1995 Hauser photograph were used in GSK's advertising materials.  Kapur

explained that it was the "current photos that provided us with specifically what we needed from a currency, mood, and communications standpoint for our ads." (Docket Entry No. 25, Ex. O, ¶ 14). The Kufner photographs were used from June 2002 until October 2002, and the Shoemake photographs were used from August 2002 until October 2003. (Docket Entry No. 29, Ex. B-9). Straus does not contend that these photographs infringe on his copyright.

### B.     The Claim Based on the Drugstore Shelf Advertisements in March 2002

Straus's second infringement claim against DVC and GSK concerns a "shelftake" advertisement for GSK's NICORETTE product, which featured a copy of his 1989 photograph. Straus discovered the shelftake in an Eckerd drugstore in Houston, Texas on March 11, 2002. (Docket Entry No. 29, Ex. A-17). GSK's license agreement to use Straus's 1989 photograph of Palmer had expired at the end of February 2002. Straus does not allege or present evidence that any other shelftake advertisements were used after the license agreement expired.

GSK submitted competent summary judgment evidence showing that this shelftake advertising was inadvertently left in one store for a short period after the license agreement expired. GSK hired a third party, News America Marketing, to install in-store marketing materials for the GSK advertising campaign and to remove and replace materials that were no longer to be used. In his declaration, Kapur stated that GSK retained News America Marketing to distribute and remove the marketing materials containing Straus's 1989 photograph of Palmer to approximately 23,000 stores, which included 12,000 drug stores, 8,000 food stores with pharmacies, and 3,500 mass merchandisers. (Docket Entry No. 39,

Ex. B, ¶ 4).  News America Marketing was to remove the materials once the license period had expired.  News America Marketing inadvertently failed to remove the shelftake advertising materials from one Houston drugstore.  The materials remained for less than one month after the license expired.

On April 16, 2002, News America Marketing sent Straus an apology letter stating that this was an isolated event.  (Docket Entry No. 39, Ex. D).  On July 17, 2002, News America Marketing sent Straus a letter about an invoice he had sent to DVC seeking $5,000 for a one-month extension of the licensing agreement for the inadvertent continued use of the photograph.  (*Id.*).  News America Marketing stated that the copyrighted photograph was used in materials left in only one store for a brief time after the license agreement expired.  News America Marketing offered Straus $500 for this brief unauthorized use but refused to pay the $5,000 invoiced.  Straus did not accept the $500.  (Docket Entry No. 39, Ex. E).

GSK admits that the use of Straus's 1989 photograph on this shelftake advertisement after the expiration of the parties' licensing agreement was unauthorized.  The defendants have moved for summary judgment on this claim on the basis that the unauthorized use of one shelftake advertisement in one store for such a brief period was *de minimis*.  (Docket Entry No. 39).

### C.    The Claim Based on the "Snippet" Used in a Television Commercial

Straus also alleges that DVC and GSK infringed by using his 1989 photograph of Palmer in a television commercial that ran in December 2001 and early 2002.  In late 2001, Straus and DVC discussed, but did not agree on, the use of Straus's photograph of Palmer

in a series of thirty-second television advertisements featuring Palmer and the GSK products. (Docket Entry No. 49, Ex. 1-B at 255:21–257:4). Between December 2001 and March 2002, four different thirty-second advertisements for GSK's antismoking campaign featuring Arnold Palmer ran nationwide on major television networks, cable channels, and in syndication. (Docket Entry No. 39, Ex. G). One of these commercials contained a brief "snippet" of Straus's 1989 photograph of Palmer. That commercial aired 509 times nationwide between December 2001 and March 2002. That commercial featured a "live" Arnold Palmer walking on a golf course and discussing the benefits of not smoking, the effectiveness of the NICORETTE and NICODERM products in stopping, and the advantages of GSK's "Quitting Together Kit," designed to help smokers stop.[2] In the allegedly infringing commercial, Straus's 1989 photograph of Palmer appears on the cover of the "Quitting Together Kit" that is shown briefly as a narrator states that purchasers of either NICORETTE or NICODERM may receive the "Quitting Together Kit" for free. The parties dispute how long Straus's 1989 photograph of Palmer appears on the television screen. The defendants claim that it appears for no more than one second; Straus claims that it is on the screen for three seconds. Straus does not allege that the use of the 1989 photograph on the "Quitting Together Kit" was unauthorized. That use was provided for in the parties' licensing agreement. Straus does allege that showing the cover of the Kit with the photograph in a television commercial exceeded the agreement.

---

[2] A DVD containing a copy of the commercial is in the record at Docket Entry No. 39, Ex. F.

GSK admits that its use of Straus's 1989 photograph in the television commercial was unauthorized but states that it was an accident and that the use was *de minimis*.  GSK explains that it hired a company called Arnold McGrath to create the television commercials for the GSK advertising campaign.  Arnold McGrath asked DVC for samples of the smoking-cessation products to use in positioning images of the products in the advertisement.  (Docket Entry No. 39, Ex. B, ¶ 6).  The defendants state that they did not realize Arnold McGrath intended to use those products in a commercial.  Both defendants state that had they known, they would not have allowed the "Quitting Together Kit" with Straus's photograph to be used in the commercial.  (*Id.*).  Despite the admitted unauthorized use, the defendants have moved for summary judgment on this claim, arguing that the use of the photograph in the commercial was *de minimis* and did not amount to actionable infringement.  (Docket Entry No. 39).

### D.    The Claim that DVC Infringed by Including the Photograph on Its Website

Straus's fourth infringement claim is based on advertising materials DVC posted on its website to show potential clients the work it had done for other clients in the past.  The advertising materials posted included advertisements created for GSK using the 1989 photograph of Arnold Palmer.  Straus does not contend that the use of the photograph in the advertisements is infringing; rather, he argues that DVC's use of the advertisements on its website to promote its own advertising business infringes.

DVC Worldwide is subdivided into smaller operating divisions, each with its own domain linked through DVC Worldwide's domain, "http://www.dvcworldwide.com." DVC healthcare division's website was located at "http://www.dvchealthcare.com." DVC's healthcare division provided the marketing services for the GSK advertising campaign during 2002. (Docket Entry No. 37, Ex. A, ¶¶ 5–7). The website featured DVC "success stories" and served as an online portfolio of DVC's work. (Docket Entry No. 49, Ex. 1-B at 202:21–203:3). On the healthcare division's website, DVC posted materials created for the GSK advertising campaign to promote its advertising work to potential clients. The website contained a number of case studies, not just the GSK advertising campaign.

DVC posted four webpages showing its work on the GSK campaign. The DVC advertisement containing Straus's 1989 photograph of Palmer appears on one of the four pages. (Docket Entry No. 37, Ex. B). On that page, the photograph appears in the upper left corner and occupies a space approximately two inches high by two inches wide. Below the advertisement is a picture of the DVC vice-president who worked with GSK on this campaign and developed the marketing materials. The right-hand side of the page features narratives from DVC about the advertising campaign. (*Id.*). A copy of this webpage appears at Appendix D. The other webpages show other advertising materials DVC created for the GSK advertising campaign, including some with the modified 1995 Hauser photograph of Palmer. None of the other pages contains Straus's photograph of Palmer. These pages follow the same format as the page containing the advertisement using the Straus photograph, with the DVC vice-president's picture below the advertisement and a narrative along the

14

right side of the page.  Straus does not contend that the use of these images infringe his copyright.

DVC states that it has no record of when the advertisement using Straus's photograph first appeared on the healthcare division's website or how long it remained there.  DVC initially estimated that the photograph was on the website for approximately two months, based on the practice of that company to replace their webpage materials with new content every two months.  (Docket Entry No. 37, Ex. A, ¶ 21).  Straus introduced evidence showing that the photograph may have remained on the website from December 2004 until June 2006.  (Docket Entry No. 49, Ex. 1-C).  Straus argues that although he gave DVC notice that his photograph was being used without authorization on DVC's website in December 2004, when he filed this suit, DVC did not remove the photograph until June 2006.  DVC responds that its healthcare division experienced financial difficulties beginning in late 2004 and that by December of that year, the division was "essentially non-existent."  (Docket Entry No. 37, Ex. A, ¶¶ 25–26).  The company closed its healthcare division in January 2005.  DVC states that the employees responsible for creating the website no longer worked for the company when it closed the healthcare division in January 2005.  As a result, the materials were inadvertently left on the website after the division closed.  (Docket Entry No. 37, Ex. C at 154:1–15).

In its motion for partial summary judgment, DVC argues that posting advertising materials it had created to promote itself to potential clients constitutes fair use.  Alternatively, DVC argues that this self-promotional use is covered under a limited, implied

nonexclusive license resulting from the parties' relationship and industry custom and usage. DVC introduced a declaration by Jeff Sedlik, an expert on licensing, stating that it is common industry practice for advertising agencies to use works created for clients for self-promotional materials. (Docket Entry No. 37, Ex. E, ¶ 10). Sedlik explains that because the agencies have "paid a photography or stock photography agency for a license to incorporate a photograph in an advertisement . . . for distribution in specified media, an advertising agency typically does not approach a licensor to request additional permissions (or to seek an additional express grant of rights) for de minimis archival and self promotional uses." (*Id.*, ¶ 8). Instead, "[p]hotographers and ad agencies routinely display copies of advertisements in industry award shows, presentations to potential clients, printed self-promotional materials, printed portfolios, and in web site portfolios. The reciprocal nature of such use is a widespread and long-standing tradition in the industry." (*Id.*). Straus does not offer evidence to controvert this assertion.

### E.   The Summary Judgment Motions and Evidence Relating to Straus's Damages Claims

Straus seeks actual damages for the infringing uses he alleges, based on lost licensing fees. He also seeks to recover the profits GSK and DVC derived from the alleged infringing acts under 17 U.S.C. § 504(b), or in the alternative, statutory damages under 17 U.S.C. § 504(c). (Docket Entry No. 1 at 4). In answers to interrogatories, Straus stated that in calculating the lost license fees, he is seeking a tenfold multiplier for a retroactive license of the infringing uses. He seeks to recover $1,418,000.00 in actual damages for the alleged

infringing uses of his 1989 photograph of Palmer.  (Docket Sheet No. 36, Ex. C).  The defendants move for summary judgment on two aspects of Straus's damage claims:  the claim for profits and the tenfold multiplier in the actual-damages calculation.  As to the first, the defendants argue that Straus has not shown that the uses of his copyrighted photograph outside the license had any effect on their revenues.  As to the second, the defendants argue that Straus's claim for a tenfold increase is punitive and not allowed under the Copyright Act.

GSK presented summary judgment evidence showing that a large number and variety of factors affect the revenues generated from the sale of GSK's smoking-cessation products. (Docket Entry No. 36, Ex. E, ¶ 6).  One of those factors is its advertising campaign featuring Arnold Palmer.  Other factors include environmental and social factors, such as tax increases on cigarettes or smoking bans in restaurants.  (*Id.*, ¶ 8).  GSK states that when these events occur, interest in quitting smoking increases, driving up revenue in its products.  GSK also asserts that price discounts often increase sales, as do the frequency and intensity with which it promotes its products.  (*Id.*, ¶¶ 10–12).  The value of the NICORETTE and NICODERM trademarks and the company's reputation play significant roles in generating revenue.  (*Id.*, ¶¶ 13–14).  Package design affects sales.  Efforts to encourage physicians to recommend the products to their patients affect sales.  (*Id.*, ¶¶ 15–16).  Drug stores, grocery stores, and other retailers buy GSK's smoking-cessation products directly from GSK, a process called "selling to the trade," which adds another layer of complexity to identifying revenue sources.  (*Id.*, ¶ 19).  GSK states that stores often increase their purchases seasonally or when they anticipate price increases rather than in reaction to a particular advertising campaign.

GSK acknowledged that advertising featuring a particular spokesperson may affect sales figures.  GSK presented evidence showing that the extent of any such influence depends on a variety of factors, including the amount of money the company spends to promote the spokesperson's message, the nature of the advertising photographs used, and the length of time the spokesperson promoted its products.  (*Id.*, ¶ 20).  GSK used Arnold Palmer as the spokesperson for its smoking-cessation products between 2002 and 2004.  GSK ended the arrangement when it determined that using Palmer as the spokesperson was not resulting in any significant increase in sales.  GSK learned that Palmer's primary audience was made up of nonsmokers, who were less likely to purchase NICORETTE and NICODERM than smokers.  GSK stopped using Palmer to promote its products and began a marketing campaign in conjunction with NASCAR, determining that NASCAR fans included more likely candidates for its products than the general population.[3]  GSK also introduced the report of its damages expert, Karyl Van Tassel.  (Docket Entry No. 36, Ex. K at 7).  Van Tassel concluded that because GSK analyzes marketing campaigns as a whole rather than specifically identifying the results of any specific aspect, allocating revenues and related profits to any specific photograph would be "extremely difficult, if not potentially impossible

---

[3]  GSK states that as compared to the general population, NASCAR fans are 28% more likely to smoke, they consume 18% more cigarettes, are 69% more likely to smoke more than one pack per day, are 27% more likely to have attempted to quit smoking in the last year, and make more aided attempts to quit smoking. (Docket Entry No. 36, Ex. E, ¶ 25).  These figures increase among fans who attend NASCAR races in person.  In response, GSK began targeting NASCAR fans through television advertisements, sponsorship of a famous driver, and use of that driver as its spokesperson.  GSK also attends NASCAR races to promote its products and has counseling services available on-site.

to do with any reasonable degree of certainty." (*Id.*).  GSK argues that Straus has not shown

any causal connection between the alleged infringements and GSK's revenues.

DVC similarly argues that Straus cannot show any connection between its profits and

any of its alleged infringing uses of Straus's photograph.  (Docket Entry No. 40).  DVC was

GSK's marketing agent for the smoking-cessation products advertising campaign for only

one year, 2002.  (Docket Entry No. 40, Ex. A, ¶ 6).  DVC contends that Straus has failed to

show any causal link between its profits for the relevant periods and the alleged infringing

use of Straus's 1989 photograph of Palmer.  DVC notes that nothing in the in-store shelftake,

the television advertisement, or any of the advertising materials that featured the modified

1995 Hauser photograph mentioned DVC.  As to the use of Straus's 1989 photograph of

Palmer on the healthcare division's website in late 2004 until mid-2006, DVC argues that

there could not have been any affect on that division's profits because it did not receive any

new clients in 2004 and DVC Worldwide closed the healthcare division in January 2005.

(Docket Entry No. 40, Ex. A, ¶ 25–26).

In addition to the defendants' profits from the alleged infringing uses, Straus seeks to

multiply his actual damages by a factor of ten.  Straus introduced the declaration of Jane

Kinne, presented as an expert in photography and licenses for using photographs.  She states

that to determine the market value of a retroactive license, the photography industry has

developed a "sliding scale of multipliers for issuing retroactive licenses for unauthorized

infringing uses."  (Docket Entry No. 49, Ex. 2 at 3).  "Fees for retroactive licenses are greater

than those charged for prospective licenses.  The standardized use of a sliding scale of

19

multipliers in the industry recognizes this economic reality.  In my opinion, a multiplier of ten in this case is reasonable and in accord with the practices and standards of the image licensing business." (*Id.*).  Straus argues that he does not seek punitive damages in this case; rather, he seeks the market value for the infringements, which he contends includes a tenfold increase in actual damages.

In response to Straus's claim for a tenfold increase in actual damages, the defendants provide summary judgment evidence that a multiplier of ten times is not customary in the industry.  Jeff Sedlik, defendants' damages expert, states in his report that photographers may use licensing agreements that contain provisions for so-called retroactive licenses that include liquidated-damages provisions in the form of multipliers for any unlicensed use.  (Docket Entry No. 38, Ex. B, ¶ 4).  Such multipliers are a form of punitive damages.  If multipliers are included in a license agreement, they may apply as part of the parties' agreement, but would not otherwise bear on the fair market value of a license when infringement occurs.  Straus and DVC did not include a damage multiplier in their licensing agreement.  According to Sedlik, absent such an agreement, using punitive multipliers to determine a fair market value of a license is "unreasonable and inappropriate."  (*Id.*, ¶ 5).

## II.   The Parties' Objections to the Summary Judgment Evidence

Straus moves to exclude the defendants' damages expert, Karyl Van Tassel.  (Docket Entry No. 34).  Straus argues that the defendants designated Van Tassel as an expert and provided her report after the deadline for expert designations had passed.

This court's November 14, 2005 amended scheduling and docket control order set a January 3, 2006 deadline for expert designations and reports for parties with the burden of proof on an issue.  (Docket Entry No. 18).  The defendants did not designate Van Tassel as an expert until February 14, 2006, the deadline for parties to designate their rebuttal experts. Straus argues that under 11 U.S.C. § 504(b), because he sought to recover the defendants' profits as damages for the infringing use of his copyrighted photographs, the defendants had the burden of showing their "deductible expenses and the elements of profit attributable to factors other than the copyrighted work."   According to Straus, the defendants had to designate Van Tassel as an expert on these issues by the January 3, 2006 deadline because they had the burden of showing that their revenues were caused by factors other than the infringing acts.

The defendants did not have the burden to show that their revenues are attributable to factors other than the alleged infringement until Straus presented evidence of a causal link between the infringing acts and their revenues.  *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 567 (1985); *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005). Section 504(b) creates a burden-shifting approach to establishing damages.  The motion to strike the testimony of Van Tassel is denied.

Straus also moves to strike the defendants' expert testimony on the defendants' claim for attorneys' fees on the basis that the defendants did not disclose these experts until the deadline for designating rebuttal experts rather than the earlier deadline for designating experts on issues as to which the party had the burden of proof.  The defendants have made

21

an affirmative claim for attorneys' fees, for which they carry the burden of proof.  The defendants' counsel admits that the failure to designate experts on this claim for fees on the earlier date in the scheduling order was an oversight. Rule 16(b) authorizes federal courts to control discovery through a scheduling order.  FED. R. CIV. P. 16(b).  "Consistent with the authority vested in the trial court by rule 16, our court gives the trial court broad discretion to preserve the integrity and purpose of the pretrial order."  *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990) (internal quotation omitted).  Courts determine whether to exclude expert testimony if it is not timely disclosed by examining the following factors: (1) the explanation, if any, for the party's failure to comply with the discovery order; (2) the prejudice to the opposing party of allowing the witnesses to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the importance of the witnesses' testimony. *Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

Attorneys' fee claims are generally resolved at the close of the case, after both liability and damages have been determined.  The defendants' delay in designating the expert testimony on their claim for attorneys' fees and in providing the report did not prejudice Straus.  The motion to strike the defendants' experts on attorneys' fees is denied.[4]

---

[4] Straus also moves to compel the production of five categories of documents.  (Docket Entry No. 35).  Straus requests the court to compel the production of documents relating to the creation of the modified 1995 Hauser photograph; documents relating to the effectiveness of DVC's advertisements that incorporated Straus's 1989 photograph in promoting DVC's services during the relevant time period; documents showing DVC's monthly gross revenues from 2000 until the present; documents to show the accuracy of DVC's narrative on its website regarding the effectiveness of their marketing campaign for NICORETTE and the NICODERM CQ Patch during the relevant time periods; and documents to show GSK's monthly gross revenues for the year 2000.  (*Id.*).  In response, the defendants assert that each category of documents has

The defendants object to, and move to strike from the summary judgment record, a report of Straus's expert witness, Jane Kinne, on the basis that the report was not in either affidavit or declaration form and was merely an unsworn statement.  (Docket Entry No. 30 at 1).[5]  In response, Straus stated that he did not intend to include the report as summary judgment evidence.  (Docket Entry No. 31 at 1).  Straus later stated, in a reply to the defendants' response, that he did want to include the report—now accompanied by a declaration from Kinne—in the summary judgment evidence.  (Docket Entry No. 33, Ex. A). Defendants contend that Kinne's declaration is vague and contains nothing more than unsupported legal conclusions that are not properly considered as summary judgment evidence.  (Docket Entry No. 45 at 10).

Kinne's declaration states that her opinions are contained in her December 13, 2005 expert report.  (Docket Entry No. 33, Ex. A).  Kinne's report was signed, stated her opinions and the basis for them, and included her curriculum vitae, in accordance with the Rule 26(a)(2)(B) requirements.  FED. R. CIV. P. 26(a)(2)(B); (Docket Entry No. 29, Ex. B-10). While filing Kinne's unsworn expert report did not constitute admissible summary judgment evidence, *see* FED. R. CIV. P. 56(e), that deficiency was cured by filing the sworn declaration on July 10, 2006.  *See, e.g., Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) (suggesting that, had a party been on notice that an expert's letter, which was attached by the

---

either been produced or they have no documents responsive to the request.  (Docket Entry No. 46).  This motion is denied as moot.

[5] Kinne's unsworn expert report is in the record at Docket Entry No. 29, Ex. B-10.

opposing party to its summary judgment motion, could not be considered on summary judgment, the party could have obtained a sworn affidavit of the expert that would, presumably, have merely reiterated what was already in the letter, so that the court committed prejudicial error by excluding the letter sua sponte); *Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003) (holding that an unsworn report, which was introduced without any supporting affidavit verifying its authenticity, was not admissible as summary judgment evidence, but suggesting that an appropriate affidavit verifying the unsworn report would have made the report admissible for purposes of summary judgment); *Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1065 (N.D. Iowa 2006) ("This court concludes that subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment."); *Feltner v. Partyka*, 945 F. Supp. 1188, 1191 (N.D. Ind. 1996) (same).

The substantive flaws that defendants argue are present in Kinne's expert report are properly considered in deciding whether there is a fact issue as to infringement that precludes summary judgment.  To the extent the defendants argue that the entire report should be stricken from the summary judgment evidence, the motion is denied.

## III.    The Legal Standard on Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The movant bears the burden of identifying those portions of the record it believes demonstrate

24

the absence of a genuine issue of material fact.  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d

347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the

burden of proof at trial lies with the nonmoving party, the movant may either (1) submit

evidentiary documents that negate the existence of some material element of the opponent's

claim or defense, or (2) if the issue is one on which the opponent will bear the ultimate

burden of proof at trial, demonstrate that the evidence in the record insufficiently supports

an essential element.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment

must demonstrate the absence of a genuine issue of material fact but need not negate the

elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540

(5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action."

*DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty

Lobby, Inc*., 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden,

the summary judgment motion must be denied, regardless of the nonmovant's response.

*Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir.

2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot

survive a summary judgment motion by resting on the mere allegations of its pleadings.  The

nonmovant must identify specific evidence in the record and articulate the manner in which

that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics

Trafficking Task Force*, 379 F.3d 293, 302 (5th Cir. 2004).  This burden is not satisfied by

"some  metaphysical  doubt  as  to  the  material  facts,"  "conclusory  allegations,"

25

"unsubstantiated assertions," or "only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV.   The Motions for Partial Summary Judgment as to Infringement

### A.   Straus's Claim Based on the Modified 1995 Hauser Photograph

The defendants assert that based on the undisputed facts and the applicable law, the use of the modified 1995 Hauser photograph of Arnold Palmer in GSK's advertising campaign did not infringe on Straus's 1989 photograph. Straus has clarified that he is not alleging that the use of the unmodified Hauser photograph infringed. The evidence is overwhelming that the photographer is different, did not use Straus's photograph in any way, and that there are numerous critical differences between the photographs. Instead, Straus alleges that the defendants intentionally modified the Hauser photograph to make it substantially similar to the Straus photograph and an infringement on the copyright.

A claim for copyright infringement requires a showing that the plaintiff owns a valid copyright and the defendant copied constituent elements of the plaintiff's work that are original. *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 368–69 (5th

26

Cir. 2004) (citing *Gen. Universal Sys. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004); *Szabo v. Errisson*, 68 F.3d 940, 942 (5th Cir. 1995)).  Actionable copying—the second element—requires a showing of factual copying and substantial similarity.  *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003).  Factual copying "can be proven by direct or circumstantial evidence."  *Id.*  "As direct evidence of copying is rarely available, factual copying may be inferred from (1) proof that the defendant had access to the copyrighted work prior to creation of the infringing work and (2) probative similarity."  *Peel & Co. v. Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001).  To determine access, the court considers whether the person who created the allegedly infringing work had a reasonable opportunity to view the copyrighted work.  *Id.*  Probative similarity is part of determining whether factual copying may be inferred.  In evaluating probative similarity, a court should compare the works in their entirety, including both protectible and unprotectible elements. *See Positive Black Talk Inc.*, 394 F.3d at 370 n.9 (quoting *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994)).  This inquiry is not the same as the substantial similarity inquiry.  The substantial similarity inquiry examines whether, if a plaintiff has established factual copying and the defendant does not establish independent creation, the plaintiff can show that the copyrighted work and the allegedly infringing work are so similar as to make the factual copying legally actionable.  *See id.* at 370 (citing *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 & n.4 (5th Cir. 1994) (adopting the term "probative similarity"); *Bridgmon*, 325 F.3d at 576 & n.7, 577 (noting that "probative" and "substantial" similarity are analytically distinct concepts)).

27

Once a plaintiff has established factual copying, and the defendant does not show

independent creation, the plaintiff must then prove that the copyrighted work and the

allegedly infringing work are substantially similar. *Bridgmon*, 325 F.3d at 577. In *Creations*

*Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997), the Fifth Circuit stated, "To

determine whether an instance of copying is legally actionable, a side-by-side comparison

must be made between the original and the copy to determine whether a layman would view

the two works as 'substantially similar.'"

> Substantial similarity requires that the copying is quantitatively
> and qualitatively sufficient to support the legal conclusion that
> infringement (actionable copying) has occurred. The qualitative
> component concerns the copying of expression, rather than
> ideas, a distinction that often turns on the level of abstraction at
> which the works are compared. The quantitative component
> generally concerns the amount of the copyrighted work that is
> copied, a consideration that is especially pertinent to exact
> copying. In cases involving visual works, like the pending one,
> the quantitative component of substantial similarity also
> concerns the observability of the copied work—the length of
> time the copied work is observable in the allegedly infringing
> work and such factors as focus, lighting, camera angles, and
> prominence.

*Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997). In determining

substantial similarity, courts compare only the protectible, copyrightable aspects of the two

works. *See Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533–34 (5th Cir.

1994).

Although the substantial similarity question typically should be left to the factfinder,

summary judgment is appropriate if the court can conclude, after viewing the evidence and

drawing inferences in a manner favorable to the nonmoving party, that no reasonable juror could find substantial similarity of ideas and expression. *Peel & Co.*, 238 F.3d at 395.  In this case, both sides have moved for partial summary judgment on the issue of substantial similarity. (Docket Entry No. 24 (Defendants' Motion for Partial Summary Judgment with Respect to Straus' Claim that an Image of Arnold Palmer Taken in 1995 by a Photographer named Mark Hauser, with certain Modifications made thereto years later in 2001 by GSK, is an alleged Derivative Work of Straus' 1989 Photograph); Docket Entry No. 29 at 11 (Plaintiff's Response ("The Fifth Circuit has cautioned that [the issue of substantial similarity] should typically be left to the factfinder.  Here, however, the summary judgment record demonstrates that the Manipulated Image [the modified Hauser photograph] and the Straus Image are substantially similar."))).

Straus's 1989 photograph of Palmer  was protected by two valid copyrights, one filed in 1997, (Docket Entry No. 29, Ex. A-10), the other filed in 1999, (*id.*, Ex. A-11).  The defendants had access to Straus's 1989 photograph.  The parties entered into a licensing agreement for a limited use of the photograph in late 2001 and extended that agreement through February 2002.  (*Id.*, Exs. A-12, A-14).  Within the authority of the license, the defendants used Straus's photograph in GSK advertisements.

The evidence shows that the defendants obtained the 1995 Hauser photograph to use instead of the 1989 Straus photograph.  The 1995 Hauser photograph was not copied from, nor taken with any awareness of, the earlier Straus photograph.  The only claim is that the modified version of the 1995 Hauser photograph infringed the 1989 Straus photograph of the

same subject, Arnold Palmer.  The defendants dispute any factual copying.  The more limited issue raised by the defendants' motion for partial summary judgment is whether the modifications the defendants made in 2001 to the 1995 Hauser photograph made it substantially similar to the 1989 Straus photograph.

In late 2001, GSK's art department modified Hauser's 1995 photograph by darkening the color of the shirt Palmer was wearing and lightening the collar and placket, removing the umbrella-shaped pin, and correcting the colors of Palmer's skin tones.  Straus argues that the two pictures are substantially similar because the shirts are the same color and both have white collars and plackets; neither shows Palmer's "signature" umbrella-shaped lapel pin; and the modified 1995 Hauser photograph changed Palmer's face to appear younger.  GSK's corporate representative, Steve Kapur, stated in his declaration that after GSK had used Hauser's 1995 photograph, it realized that adjustments should be made.  (Docket Entry No. 25, Ex. O, ¶ 7).  Kapur stated that the bright blue color of Palmer's shirt appeared in varying shades of blue and green when reproduced, depending on the medium.  (*Id.*, ¶¶ 8, 9).  GSK darkened the shirt to allow the photograph to be used against a variety of background colors. The modified shirt color was "is a more subdued color [than the 1995 Hauser photograph] . . . allow[ing] people's eyes to see the head lines, to see Mr. Palmer's face . . . and it also allows the color of our packages to grab their eye as opposed to fighting with a bright blue shirt."  (*Id.*, ¶ 12).  GSK lightened the shirt's collar to provide better contrast between Palmer's sun-tanned face and the dark shirt.  (*Id.*, ¶ 8).  Kapur stated that the corrections to the skin tone are typically done and were not intended to make Palmer look

30

younger.  Indeed, Kapur stated that GSK did not want a photograph of Palmer as he appeared in 1989, but a photograph of the older Palmer, which more people would be likely to relate to.  (*Id.*, ¶ 11).  Sedlik also stated that retouching the blemishes on Palmer's face was consistent and customary advertising design practice.  (Docket Entry No. 24, Ex. P, ¶ 10).

Because the substantial similarity analysis requires comparison of the protectible copyrightable aspects of the two works, the first issue is which elements are protectible under copyright law.  *See Kepner-Tregoe*, 12 F.3d at 534 ("To determine the scope of copyright protection in a close case, a court may have to filter out ideas, processes, facts, idea/expression mergers, and other unprotectible elements of plaintiff's copyrighted materials to ascertain whether the defendant infringed protectible elements of those materials.").  Unprotected aspects include the general subject.  *See id.* at 533–34; 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.08[E][1] (2005) ("[C]opyright in [a] photograph conveys no rights over the subject matter conveyed in the photograph).  Unprotected aspects also include "scenes a faire," which are stock, standard, or common elements of a photograph that "necessarily result from the choice of a setting or situation."  *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986); *see also Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 360 (2d Cir. 1983).

Protectible aspects of photographic works may include the angle from which the picture was taken, the lighting techniques used, shading, exposure, and developing techniques.  *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 452 (S.D.N.Y. 2005) (such elements are "originality in the rendition").  These elements address *how* the photograph

depicts its subject matter rather than *what* is depicted.  *Id.*; *see also* 1 Nimmer § 2.08[E][1] (stating that the protectible elements of a photograph generally include lighting, selection of film and camera, angle of photograph, and determination of the precise time when the photograph is to be taken).  "[I]n cases involving photographs, a plaintiff's copyrights cannot monopolize the various poses used, and can protect only plaintiff's particular photographic expression of these poses and not the underlying ideas therefor."  *Kisch v. Ammirati & Puris Inc.*, 657 F. Supp. 380, 382 (S.D.N.Y. 1987); *see also Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp.2d 382, 393 (S.D.N.Y. 2005).

A side-by-side comparison of Straus's 1989 photograph of Palmer and the modified 1995 Hauser photograph of Palmer reveals that, as a matter of law, substantial similarity is lacking.[6]  Straus testified that he did not believe the original 1995 Hauser photograph was substantially similar to his 1989 photo.  (Docket Entry No. 24, Ex. L at 173:9–174:24).  The idea of taking a portrait of Arnold Palmer is not protectible.  Nor is the general pose in which he sits for the portrait.  There are a limited number of positions in which one can sit to take a portrait; Straus has no monopoly on portraits of Arnold Palmer in which he sits upright and

---

[6] "[A] side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'"  *Gen. Universal Sys. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004) (quoting *Creations Unlimited*, 112 F.3d at 816).  An expert's conclusory statement that there is substantial similarity must be based on admissible summary judgment evidence that will enable the court to examine the competing documents side by side and determine whether a genuine issue of material fact has been raised on substantial similarity.  *See, e.g.*, *Melton v. Teachers Ins. & Annuity Assoc. of Am.*, 114 F.3d 557, 559 (5th Cir. 1997) ("A summary assertion made in an affidavit is simply not enough evidence to raise a genuine issue of material fact."); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc) ("[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden.").

faces the camera.   Palmer's fame rests on his golf career; there is no monopoly on photographs showing him in golfing clothes.

Comparing the two photographs shows a number of significant differences:

- The facial expressions are different.  Palmer's smile is open-mouthed with his teeth showing in the Straus picture.  In Hauser's photograph, Palmer's mouth is closed and his smile does not show any teeth.

- The light is different.  Straus's 1989 photograph was taken outdoors and Straus used only sunlight in illuminating his subject.  Palmer's face is fully lit with no shadows and his eyes are squinted.  Hauser took his photograph indoors, using the natural light through a window supplemented by artificial lighting.  In the Hauser photograph, Palmer's face is shadowed heavily on his right side and his eyes are open much wider than they are in the Straus photograph.

- The angles are different.  In the Straus photograph, the photograph was taken from an upward angle, while the Hauser photograph looks down on Palmer.

- The subject is—and looks—significantly older in the later photograph.  The modifications to the skin tone color in the 1995 photograph do not, as Straus asserts, make the subject look six years younger.  Palmer appears significantly older in Hauser's 1995 photograph than in

33

Straus's 1989 photograph, even after the modifications made to the Hauser photograph to correct the skin tone colors.

- The poses are different. In Straus's 1989 picture, Palmer sits with his arms crossed in front of his body. In the modified 1995 Hauser version, Palmer's arms are down at his sides. Although the photographs show the head and shoulders, the difference in pose is apparent.

Straus has not shown that the evidence supports an inference that modifying the noninfringing 1995 Hauser photograph by darkening Palmer's shirt, lightening his collar and placket, removing the umbrella pin, and correcting the skin tones of Palmer's face created an infringing photograph. As a matter of law, a reasonable jury could not find that the modified 1995 Hauser photograph is substantially similar to Straus's 1989 copyrighted photograph of Arnold Palmer. Summary judgment is granted as to this claim.

**B.     The Claim Based on the Drugstore Shelf Advertisement in March 2002**

The defendants move for summary judgment dismissing Straus's infringement claim based on the shelftake advertisement inadvertently left in the Eckerd drugstore in Houston in March 2002. The defendants argue that this use, while unauthorized, was not legally infringing because it was *de minimis*.

The *de minimis* doctrine provides that if unauthorized copying is sufficiently trivial, "the law will not impose legal consequences." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172–73 (2d Cir. 2001) (citing *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 74 (2d Cir. 1997)). In *Ringgold*, the court identified three meanings of "*de minimis*" in the

34

copyright context:  (1) "what [*de minimis*] means in most legal contexts: a technical violation of a right so trivial that the law will not impose legal consequences" ("technical" trivial violation); (2) "that copying has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying" (copying to a trivial extent); and (3) as relevant to "fair use," in the sense of "'the amount and substantiality of the portion used in relation to the copyrighted work as a whole'" (triviality of the copied portion of the copyrighted work).  *Ringgold*, 126 F.3d at 74–75.  To establish that an infringement is quantitatively *de minimis* and therefore not actionable, the alleged infringer must demonstrate that the copying of the protected material is so trivial "'as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying.'"  *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998) (quoting *Ringgold*, 126 F.3d at 74).  "In determining whether or not the allegedly infringing work falls below the quantitative threshold of substantial similarity to the copyrighted work, courts often look to the amount of the copyrighted work that was copied, as well as, (in cases involving visual works), the observability of the copyrighted work in the allegedly infringing work."  *Id.* (citing *Ringgold*, 126 F.3d at 75).  The qualitative element looks at the amount of the copyrighted work that is copied.  *Id.*

The defendants contend that the shelftake advertisement containing Straus's photograph of Palmer that was left in one Eckerd drugstore for less than one month after the expiration of the parties' licensing agreement was *de minimis*.  Straus does not dispute the

35

evidence as to the nature and extent of the unauthorized use.  The shelftake featured the photograph that Straus had licensed for DVC and GSK's use in their advertising campaign, but remained on the shelf of one store for less than one month after the license expired.  The license allowed the use of the copyrighted photograph in 25,000 shelftalks and 25,000 shelftakes. The initial two-month license for November and December 2001 cost $17,566.26, and included 20,000 additional in-store displays for January 2002.  The two-month extension for January and February 2002 cost $9,000 and covered only the 25,000 shelftalks and shelftakes.

The defendants state that this unauthorized use in March 2002 was accidental.  DVC retained News America Marketing to distribute the advertisements with Straus's copyrighted photograph to over 23,000 stores, including 12,000 drug stores, 8,000 food stores with pharmacies, and 3,500 mass merchandisers.  News America Marketing was responsible for retrieving all the in-store advertisements when the license agreement expired.  The defendants have submitted a series of letters News America Marketing sent to Straus in 2002, in which News America Marketing apologized for the oversight, assured Straus that no other in-store advertisements with his copyrighted photograph had been overlooked, and offered Straus $500.  (Docket Entry No. 39, Ex. D).  Straus declined the offer.  He alleges the right to recover $50,000 for the inadvertent presence of the shelftake advertisement left in one store (out of 23,000) for one month after the license expired.  Straus does not allege or present evidence that any other advertisements were left in any other stores after the license agreement expired.

The undisputed evidence is that one shelftake advertisement including Straus's 1989 photograph of Palmer remained in one store—out of 23,000—for less than one month, following a nationwide advertising campaign in which the photograph was licensed for use in advertisements in 23,000 stores for four months.  This unauthorized use is so trivial as to fall below the threshold required for actionable copying.  Straus's claim fails, as a matter of law.

### C.    The Claim Based on the "Snippet" Used in a Television Commercial

The defendants also move for summary judgment dismissing Straus's infringement claim based on the "snippet" of a television commercial that included a product displaying Straus's 1989 copyrighted photograph on the package.  The summary judgment evidence presented by the defendants shows that Arnold McGrath, the third-party agency that produced four television commercials, mistakenly included in one commercial a brief shot of a product package that included the 1989 Straus photograph.

The television commercial features a "walking, talking" Arnold Palmer.  The computer-generated copy of the Straus photograph of Palmer appears on the cover of a product package that is reduced in size and is a "tag" in the background at the end of one of the four commercials.  The defendants argue that this admittedly unauthorized use of Straus's photograph was *de minimis* because it appeared only for a few seconds during one of four thirty-second commercials, in a reduced size, and so small and out of focus as to be indistinguishable from any of the other pictures of Palmer used in the advertising campaign. (Docket Entry No. 39 at 10).

The defendants rely on *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215 (2d Cir. 1998), in asserting that their use of Straus's photograph in the television advertisements was *de minimis*. In *Sandoval*, the Second Circuit held that the defendant's unauthorized use of several of plaintiff's copyrighted photographs in a feature-length film was *de minimis*. *Id.* at 218. The court noted that the photographs appeared one hour and seventeen minutes into the movie, in a scene lasting approximately 90 seconds. During the scene, the photographs could be seen in eleven different camera shots. The longest view of any of the photographs was six seconds. The photographs were out of focus and with two exceptions appeared in the distant background, while the actors appeared in the foreground. The court concluded that the poor lighting, the fact that the photographs were seen only briefly and from a great distance, and were blurry, made them "virtually unidentifiable." *Id.* As a result, the unauthorized use was *de minimis* and not actionable.

This court has viewed the allegedly infringing commercial. The Straus photograph appears for two to three seconds at the end of the thirty-second commercial. During the commercial, Arnold Palmer is walking on a golf course and talking about the benefits of quitting smoking. He encourages the viewer to try several products to help quit. Three GSK smoking-cessation products are displayed at the end of the commercial, in reduced size. They are the "Quitting Together Kit," which appears as box-shaped package with Straus's photograph on the front, a box of NICORETTE, and a box of NICODERM CQ, both shown as product packages with only the identifying brand names. The three products are arranged in a triangular pattern with the Kit showing Straus's photo at the top and the other two

product boxes below.  During the few seconds that these products are displayed, a narrator states that purchasers of either NICORETTE or NICODERM CQ may receive the "Quitting Together Kit" for free.

The commercial shows Straus's 1989 photograph on the front of the "Kit" box reduced to a relatively small size.  On a screen measuring 13.5 inches in width by 11.5 inches in height,  the photograph is 1 inch by 1 inch in size.  It is out of focus, identifiable as a photograph of Arnold Palmer's face but not as a specific photograph. The aspects that made the "snippet" of the film in the *Sandoval* case *de minimis* are present in this commercial as well.  As a matter of law, the unauthorized use of Straus's photograph is quantitatively *de minimis*.  The defendants' summary judgment motion on this claim is granted.

### D.    The Claim that DVC Infringed by Including the Photograph on Its Website

DVC also moves for summary judgment on Straus's claim that the unauthorized use of his 1989 photograph of Palmer in advertising material it displayed on its own healthcare division's website infringed.  DVC argues that the fair-use doctrine entitled it to use Straus's photograph for the limited purpose of providing examples of its own work on its website, where it could be seen by prospective clients.  DVC characterizes the webpages as an online portfolio of some of its work.  (Docket Entry No. 37).

Congress has excepted from infringement copying that amounts to "fair use" under 17 U.S.C. § 107.  Section 107 provides a nonexclusive list of factors that must be considered in determining fair use:

(1)     the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)     the nature of the copyrighted work;

(3)     the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)     the effect of the use on the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  The statute identifies "criticism, comment, news reporting, teaching . . . scholarship, or research" as examples of what might constitute fair use.  *Id.*  The fair-use doctrine is "designed primarily to balance the exclusive rights of a copyright holder with the public's interest in dissemination of information affecting areas of universal concern, such as art, science, and industry."  *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (2d Cir. 1979) (internal quotations omitted).

The first fair-use factor, the purpose and character of the use, generally affords commercial users less protection than educational or other noncommercial users.  *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 409–10 (5th Cir. 2004).  But "[w]hile commerciality generally weighs against finding fair use, it does not end the inquiry; rather, the fair use determination depends on the totality of the factors considered."  *Id.* (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994); *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 203 (4th Cir. 1998)).

40

DVC used the unauthorized photograph on its website to promote its business.  The use was clearly commercial.  The question becomes whether this commercial use was also "transformative."

> The central purpose of this investigation is to see . . . whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative.  Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works.  Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

*Campbell*, 510 U.S. at 579 (citations and quotations omitted).  DVC argues that its self-promotion use was transformative of Straus's photograph.  The photograph was incorporated into smoking-cessation product advertising materials, for which a license was required and obtained.  Straus does not claim that the use of his copyrighted photograph on the products themselves infringes. Straus does contend that displaying the photograph on materials shown on DVC's website is both unauthorized and infringing.  DVC contends that incorporating the protected photograph in a portfolio of its work transformed the photograph from a portrait of a famous golfer used to advertise a product into a display of the advertising agency's ability to advertise a healthcare product.  DVC contends that displaying the copyrighted photograph not to advertise a product, but to demonstrate the agency's ability to create

advertising for products, is a transforming use.  DVC points to the fact that the website adds
comment and discussion about the success of the advertising campaign and the work DVC
put into marketing the advertised products.  DVC argues that the self-promotional materials
on its website do not supercede the market for Straus's copyrighted photograph or for
smoking-cessation products.

There is scant authority on whether self-promotional materials can constitute fair use.
In *Fleming v. Miles*, 181 F. Supp. 2d 1143 (D. Or. 2001), the district court considered the
claim for copyright infringement brought by a graphics designer who worked on a cover
design for a CD and accompanying promotional material.  The graphics designer did not hold
the exclusive copyright.  The designer used the artwork in a portfolio containing samples of
her own work to show to prospective clients for her graphics-design business.  The court
noted that this was a commercial use but only in the sense that the defendant hoped to attract
additional business by showing samples of her work, not in the sense that the defendant was
selling the art itself or using the art to advertise and sell an unrelated product.  The court held
that even if this use was not authorized by the copyright holder, it was fair use and not
infringing.  The court emphasized the small distribution of the promotional materials.  *Id.* at
1152–53.

In *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003), the court affirmed a fair-
use finding for the defendant's use of the plaintiff's copyrighted pictures as part of an
internet search engine.  This case did not involve using materials incorporating copyrighted
photographs for self-promotion but did analyze the effect of transforming use on the original

purpose of, and market for, the photographs. The defendants operated a search engine that used thumbnail-sized versions of the plaintiff's copyrighted photographs as part of displaying search results. The Ninth Circuit held that the defendant's unauthorized use of the plaintiff's photographs was transformative. The defendant was not selling the photographs or using them as objects of aesthetic appreciation, but merely using them as a tool for accessing internet search results. The court noted that users were unlikely to use the reduced versions of the photographs for aesthetic purposes because the low resolution resulted in a significant loss of clarity when the pictures were enlarged. *Id.* at 818–19; *cf. Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 847–49 (C.D. Cal. 2006) (the defendant's thumbnail-sized images of the plaintiff's full-sized photos used as part of the defendant's internet-search program was transformative).

In the present case, considering the unauthorized use of Straus's photograph in DVC's promotion of its advertising materials as "fair use" strains that concept too far. While DVC's posting of Straus's photograph on its website may have been transformative—in as much as it provided commentary on the advertising and was used for self-promotional purposes as opposed to marketing the smoking-cessation products themselves—"any transformative purpose [was] slight to non-existent." *Castle Rock Enter. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 142 (2d Cir. 1998). The Fifth Circuit has noted that "any commercial use tends to cut against a fair use defense." *Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1175 (5th Cir. 1980). And while commercial use and fair use can coexist, "the court may consider whether the alleged infringing use was primarily for public benefit

or for private commercial gain." *MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir. 1981).  DVC's use of Straus's photograph on its website was wholly for private commercial gain. Moreover, in *Fleming*, there was a dispute as to the true owner of the copyright.  The parties had not entered into a licensing agreement and shortly after the work was completed, both parties registered the work with the Register of Copyrights.  *Fleming*, 181 F. Supp. 2d at 1147.  No such disagreement exists here.  DVC licensed the use of Straus's photo for a limited time and for a limited purpose.  DVC's use of that photograph on its website went outside the terms of the agreement.  DVC's unauthorized display of Straus's photograph on its website is outside the scope of the fair-use doctrine.

The second fair-use factor, the nature of the copyrighted work, clearly weighs in favor of the plaintiff.  Straus created a portrait of a famous golfer and owns the copyright for that photograph.  This was plainly a creative expression, for which the fair-use doctrine's scope is more limited as compared to informative expression.  *See Hustler Magazine, Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1153–54 (9th Cir. 1986).

Similarly, the third factor, the substantiality of the protected image used, cuts in Straus's favor.  DVC used all of Straus's photograph, just as it had done legally under the parties' licensing agreement in creating the advertising materials for the GSK marketing campaign.  DVC did not crop the photograph or otherwise make less use of the photograph when it posted the picture on its website.  Such wholesale use, as compared to an infringing use that borrows only a small portion of the work, weighs against finding fair use.  *Kelly*, 336

F.3d at 820 ("While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use.").

Finally, the Copyright Act focuses on "the effect of the use on the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor requires courts to consider not only actual harm to the market for the original, but also whether widespread use of the work, like the sort complained of by the copyright-holder, would impair the potential market for the original work and any derivative works. *Campbell*, 510 U.S. at 590. This analysis requires a balancing of "the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981). "A transformative work is less likely to have an adverse impact on the market of the original than a work that merely supersedes the copyrighted work." *Kelly*, 336 F.3d at 821. No evidence supports an inference that DVC's use of Straus's photo on its website impaired his ability to license further uses of the photograph.

The majority of the fair-use factors cut against the doctrine's application. The motion for summary judgment on that basis is denied.

DVC alternatively argues that its posting of Straus's photograph on its website is permitted by an implied license. The parties' agreements did not provide for DVC to use the photograph on its website. In December 2004, Straus affirmatively told DVC of his disapproval of that use. In December 2004, when Straus discovered that DVC was using his

45

photograph on his website without permission, he filed this lawsuit, giving DVC notice of his belief of the infringing activity. DVC did not remove the photograph until June 2006.

The touchstone for finding an implied license is intent. *See John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003). "Without intent [to permit the use], there can be no implied license." *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). Courts have found implied licenses only in "narrow" circumstances when one party "created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990); *see also Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999) (determining that plaintiff gave defendant radio station implied, nonexclusive license to use jingles she had written for station). DVC and Straus licensed for a specific use of his photograph for a limited time at a set price. The license stated that Straus reserved all other rights in the photograph. Although Straus does not present expert testimony to refute the defendants' claim that implied licenses for this type of self-promotional use are part of the industry custom, he presents evidence that creates a fact issue as to whether such an implied license existed in this case after December 2004. When Straus discovered DVC's unauthorized use on its website, he put DVC on notice that he disapproved of such use and sought damages for infringement. The present record does not permit a finding that the parties had an implied license for DVC to continue to use the photograph on the website. DVC's motion for partial summary judgment is denied.

46

## V.     The Motions for Summary Judgment Relating to Straus's Damages Claims

### A.     The Issue of Indirect Profits

Section 504(b) of the Copyright Act provides that a plaintiff may seek "any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages." 11 U.S.C. § 504(b).  The plaintiff has the burden of proving that the defendant's gross revenues are specifically attributable to the sale of the infringing works. *Id.*; *Mackie v. Rieser*, 296 F.3d 909, 915–16 (9th Cir. 2002); *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 104, 107–08 (2d Cir. 1999); *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983). Once the plaintiff has presented proof of the infringer's gross revenues attributable to the sale of the infringing works, the defendant is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.  17 U.S.C. § 504(b).

This is not a case in which the defendants are alleged to have sold the copyrighted work for a profit.  Rather, this is an indirect profits case, in which defendants are alleged to have used a copyrighted photograph to sell other products.  The defendants move for summary judgment on the ground that Straus cannot meet his burden of establishing a causal link between the defendants' gross revenues and the alleged acts of infringement.  (Docket Entry Nos. 36 & 40).

"[I]n an indirect profits case, the profits 'attributable' to the infringement are more difficult to quantify.  But that difficulty does not change the burden of proof established by the statute.  The burden of establishing that profits are attributable to the infringed work often

47

gets confused with the burden of apportioning profits between various factors contributing to the profits." *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003). "The plaintiff has the burden to demonstrate a nexus between the infringement and the indirect profits before apportionment can occur." *Mackie*, 296 F.3d at 915.  Once that nexus is established, if "an infringer's profits are attributable to factors in addition to use of plaintiff's work, an apportionment of profits is proper.  The burden of proving apportionment (i.e., the contribution to profits of elements other than the infringed property), is the defendant's." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 518 (9th Cir. 1985). "When an infringer's profits are only remotely and speculatively attributable to the infringement, courts will deny recovery to the copyright owner."  4 Nimmer § 14.03[B][2] at 14-45.  "[T]o survive summary judgment on a demand for indirect profits, a copyright holder must proffer sufficient nonspeculative evidence to support a causal relationship between the infringement and the profits generated indirectly from such an infringement." *Mackie*, 296 F.3d at 915–16.

Several cases deny recovery of the defendant's profits based on revenues from selling products that were advertised through the unauthorized use of copyrighted materials.  In *Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002), *cert. denied*, 537 U.S. 1189 (2003), the Seattle Symphony used an unauthorized photograph of the plaintiff's sculpture in an advertising brochure sent to 150,000 potential customers.  The picture was one of several Seattle landmarks featured in the brochure.  The plaintiff sought to recover any profits generated from increased subscribership through the direct-mail campaign.  The Ninth

48

Circuit affirmed the district court's dismissal of the plaintiff's claim for indirect profits: "Intuitively, we can surmise virtually endless permutations to account for an individual's decision to subscribe to the Pops series [which the plaintiff's artwork advertised], reasons that have nothing to do with the artwork in question." *Mackie*, 296 F.3d at 916.

In *Polar Bear Products, Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004), the defendant Timex used the plaintiff's film footage in commercials beyond the term specified in the parties' licensing agreement. The Ninth Circuit declined to award the plaintiff any of Timex's profits received from its watch sales, reasoning that there was no causal evidence to link sales of the watches to the defendant's infringing use. *Polar Bear Prods. Inc.*, 384 F.3d at 714–15; *see also O'Connor v. Cindy Gerke & Assocs., Inc.*, 300 F. Supp. 2d 759, 770–74 (W.D. Wis. 2002) (holding that plaintiff had not shown a nexus between the defendant's infringing use of his copyrighted video to advertise newly constructed homes and the home sales).

*Andreas v. Volkswagen of America, Inc.*, 336 F.3d at 796, resulted in an award of indirect profits to the plaintiff. In that case, the defendant used the plaintiff's copyrighted phrase in a television commercial to promote the defendant's new automobile. The district court vacated the jury's award of the defendant's profits, finding that such profits were speculative and unsupported by the evidence introduced at trial. *Andreas*, 336 F.3d at 792. The Eighth Circuit reversed, holding that the plaintiff had satisfied his burden of showing a nexus between the infringement and the defendant's revenues. The evidence showed that the television commercial's message centered on the infringed phrase; the defendant touted the

commercial as an integral part of introducing its new automobile into the U.S. market; sales of the automobile during the relevant periods had increased; the commercial had received high ratings; and the defendant had paid its marketing agency a substantial bonus based on the commercial's success. *Id.* at 797; *see also Fournier v. Erickson*, 242 F. Supp. 2d 318, 327–28 (S.D.N.Y. 2003) (holding that the plaintiff was entitled to show a profits nexus by the defendant's gross revenues in its Microsoft Windows 2000 product line, but not from the sale of other products unrelated to the infringing use, where the infringing act related to the marketing of Windows 2000); *cf. Estate of Vane v. The Fair, Inc.*, 849 F.2d 186, 188–90 (5th Cir. 1988) (affirming the district court's finding that the plaintiff did not establish a causal link between the infringing use of the plaintiff's pictures in the defendant's television commercial and the defendant's profits; as evidence of nexus the plaintiff presented only its expert's regression analysis, which the district court found speculative).

Straus has submitted evidence of GSK's gross revenues attributable to sales of GSK products NICORETTE, NICODERM CQ, and COMMIT, which were marketed from 2001 to 2004 through the GSK advertising campaign. (Docket Entry No. 36, Ex. F).  Straus has also provided evidence of the DVC ActiveCare Division's gross revenues from 2003 to 2006. (Docket Entry No. 46, Ex. C).  The record shows that the GSK advertising campaign was directed toward the sales of NICORETTE, NICODERM CQ, and COMMIT; that Palmer was the spokesperson for that campaign; and that Straus's photograph of Palmer was the first photograph of Palmer used in that campaign.

50

The revenue summaries compare sales figures and expenses from 2001 through 2004 for three of GSK's smoking-cessation products: NICORETTE OTC, NICODERM, and COMMIT. The summaries indicate that sales of NICORETTE OTC rose slightly from 2001 to 2002, then dropped dramatically between 2002 and 2004.  Sales of NICODERM followed a similar pattern.  COMMIT sales, however, rose dramatically between 2002 and 2004, climbing steadily each year.  The record is unclear as to Palmer's role in marketing the COMMIT product line.  Neither party has asserted that Palmer's photograph was used to promote COMMIT and the revenue summaries indicate that GSK did not begin receiving sales revenues for COMMIT until November 2002.  (*Id.*).  The summaries do not provide any basis to conclude how much any particular marketing materials contributed to the sales figures, much less to distinguish between the effect of using materials that included unauthorized uses of Straus's photograph as opposed to authorized uses of the photograph.

In this case, Straus has not identified or presented facts in the summary judgment record that would support an inference of a causal link between the defendants' infringing use of his 1989 photograph of Palmer in some of the advertising materials used to market the smoking-cessation products and GSK's profits.  The record contains evidence of GSK's gross revenues for its smoking-cessation product line for the relevant period.  The record also shows that Arnold Palmer's role as a spokesperson was a central part of the GSK marketing campaign.  Most of the marketing campaign was based on either the defendants' authorized use of Straus's photograph of Palmer under a license agreement or the defendants' authorized use of other photographs or depictions of Palmer's face and endorsement.  The unauthorized

51

uses of Straus's copyrighted photograph of Palmer were a relatively small part of the photographs or other depictions of Palmer used in the advertising campaign. The unauthorized uses also occurred in limited ways and for short periods. Even assuming that the general GSK advertising campaign was causally linked to the revenues GSK received for selling the advertised products, (and more importantly, assuming that Straus has claims against GSK remaining, which he does not), there is no basis in the record to link the limited unauthorized and infringing uses of the copyrighted photograph that Straus alleges to all or any part of those revenues. *Mackie*, 296 F.3d at 916.

As to DVC, the evidence showing DVC's profits does not indicate which revenue was generated from its work with GSK and which revenue came from other sources. Moreover, DVC's healthcare division made insignificant net revenue during 2004. (Docket Entry No. 35, Ex. C). Straus's claims for GSK's and DVC's indirect profits fail, as a matter of law.

The defendants' summary judgment motion on indirect profits damages is granted.

### B.    Multiplying Damages

The defendants move for summary judgment on Straus's claim that he is entitled to a tenfold increase or multiplier of the actual damages he alleges. (Docket Entry No. 38). The defendants correctly point out that punitive damages are generally not allowed in cases of copyright infringement. *See* 4 Nimmer § 14.02[B], at 14-23–24; *Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir. 1983). Straus responds that he is not seeking punitive damages. Instead, he argues that his claim for an increased actual damage award is based on industry practice and custom in setting retroactive license fees.

52

In a copyright infringement case, actual damages may be determined by examining the fair market value of a license authorizing the defendant's use. *See On Davis v. The Gap, Inc.*, 246 F.3d 152 164–68 (2d Cir. 2001) (holding that a reasonable license fee—measured by the fair market value of a license authorizing the defendant's use—may be an appropriate measure of actual damages). Proof of industry practice "inarguably is crucial to the estimation of actual damages." *Bruce v. Weekly World News, Inc.*, 310 F.3d 25, 29 (1st Cir. 2002) (citing *BellSouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.*, 999 F.2d 1436, 1444 (11th Cir. 1993); *Endress & Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 892 F. Supp. 1123, 1131 (S.D. Ind. 1995), *aff'd*, 122 F.3d 1040 (Fed. Cir. 1997); *Playboy Enters., Inc. v. Dumas*, 831 F. Supp. 295, 305 (S.D.N.Y. 1993)). Straus's actual damages are determined by what a willing buyer would have been reasonably required to pay a willing seller for using Straus's photograph of Palmer. *See Davis*, 246 F.3d at 168–69 (citing authority).

The evidence showed that the parties negotiated for a license that provided GSK and DVC the use of Straus's photograph of Palmer in 20,000 in-store advertisements for January 2002 and 25,000 shelftalks and shelftakes for November and December 2001, with an extension through January and February 2002. DVC and GSK paid Straus $17,566.26 for the initial agreement, and $9,000 for the two-month extension. (Docket Entry No. 29, Ex. A-12). The license agreement did not address liquidated damages or set a fee for any unauthorized use outside the license agreement. Straus submits a report from an expert in the photography business, Jane Kinne, stating that the industry has developed a practice of

using a sliding scale for issuing retroactive licenses for unauthorized or infringing uses. (Docket Entry No. 29, Ex. B-10 at 6).  In the report, Kinne states that higher multiples are used when the unauthorized use results in the copyright holder having to resort to legal action.  "The higher multiples are used to cover the time and expense involved when clients fail to recognize their responsibility to obtain the appropriate license and to pay the corresponding fee prior to such use." (*Id.*).  She states that the sliding scale ranges from three times to as much as ten times the amount that would have been charged had the license been properly obtained before the copyrighted material was used.  Based on that industry custom, Kinne concludes that Straus's $90,000 damage calculation for the extended use of his photograph after the initial licenses expired in February 2002 should be multiplied by a factor of ten, for an actual damage award of $900,000.

The defendants cite *Stehrenberger v. R.J. Reynolds Tobacco Holdings, Inc.*, 335 F. Supp. 2d 466 (S.D.N.Y. 2004), in support of their contention that a damages multiplier of ten is a punitive, not actual, damages award.  In *Stehrenberger*, the district court granted the defendants' summary judgment motion that a tenfold damages multiplier for copyright infringement was punitive.  The plaintiff's expert in that case gave an opinion similar to Kinne's, stating that the industry custom for a retroactive license fee when the copyright holder files a lawsuit can be as high as ten times what a reasonable negotiated preinfringement license fee would have been.  *Stehrenberger*, 335 F. Supp. 2d at 467.  The district court held that the tenfold increase in actual damages would punish and not merely compensate the infringer.  The court reasoned that because copyright law already "punishes

54

and deters" through the enhanced statutory damages provision in 17 U.S.C. § 504(c), the "value of what was illegally taken is not determined by multiplying it." *Id.* at 468–69.  That court noted that the only other case to approve of an actual-damages multiplier was *Bruce v. Weekly World News, Inc.*, 150 F. Supp. 2d 313, 321 (D. Mass. 2001), *vacated in part*, 310 F.3d 25 (1st Cir. 2002).  The district court in *Bruce* applied a multiplier of five to the plaintiff's actual damages award, but only after experts for both sides agreed that industry custom provided for such multiple fee enhancement.  *Bruce*, 150 F. Supp. 2d at 321.

This court agrees with the reasoning in *Stehrenberger*.  Jeff Sedlik, the defendant's expert, states that multipliers are used only when the parties include them in licensing agreements and are enforced as part of the contract.  Multipliers are not used to determine the fair market value of a license at the time infringement occurs.  (Docket Entry No. 38, Ex. B at 2–3).  Kinne opines that to assess a license fee, it is customary to multiply the amount to reflect a higher retroactive fee and the costs of litigation.  This opinion is flawed for the reasons identified in *Stehrenberger*.  Kinne ignores the fact that the additional costs and fees of litigation are compensated by awards for those amounts.  The cases show that a higher retroactive fee is generally part of determining the fair market value, not a basis to multiply the fair market value.  Kinne's approach is a double-award, which would be punitive in nature.

The defendants' summary judgment motion dismissing Straus's claim for multiple actual damages is granted.

## VI.    The Summary Judgment Motion on the Defendants' Affirmative Defenses

Straus moves for summary judgment on the defendants' affirmative defenses of laches and equitable estoppel.  (Docket Entry No. 41).  Straus's summary judgment motion cites the defendants' representatives' testimony and discovery responses involving the claim that the defendants infringed by leaving advertising material containing Straus's 1989 photograph of Arnold Palmer in an Eckerd drugstore for one month after the parties' licensing agreement expired.   In response, the defendants withdrew their affirmative defenses of equitable estoppel and laches with respect to the claim involving the shelftalk left in the Houston drugstore in March 2002.  (Docket Entry No. 48).  The defendants continue to argue that the defenses apply to Straus's claim that GSK improperly used a computer-generated version of his 1989 photograph of Palmer in a "snippet" of a television advertisement aired in late 2001 and early 2002 and that GSK improperly modified and used the 1995 Hauser photograph of Palmer.  Because this court has granted summary judgment dismissing these claims, it need not reach the issues remaining in this motion.   Straus's summary judgment motion on affirmative defenses is denied as moot.

## VII.    Conclusion

Straus's motion to exclude the defendants' experts is denied; the defendants' motion to strike Straus's expert report is denied.  Straus's motion to compel is denied as moot.  The defendants' motions for partial summary judgment as to the claims that they committed actionable infringement of Straus's copyright by using a modified version of the 1995 Hauser photograph of Palmer; by the continued use of material containing Straus's photograph in

a Houston drugstore for one month after the license agreement expired; and by using the photograph in a brief and small part of a television commercial outside the license terms are granted.   The defendants' motion for partial summary judgment that the use of the copyrighted photograph on DVC's website claim is either fair use or implicitly authorized is denied.  GSK's and DVC's summary judgment motions on Straus's claims for indirect profits damages is granted.  The defendants' summary judgment motion on Straus's claim for a tenfold damage multiplier is granted.   Straus's summary judgment motion on affirmative defenses is denied as moot.  Straus's infringement claims against GSK are dismissed, with prejudice.  Straus's infringement claims against DVC are dismissed, with prejudice, except the claim that DVC infringed Straus's copyright by using Straus's photo of Palmer on its website without authorization.

A conference is set for **April 12, 2007**, at **9:00 a.m.**, to set a schedule to resolve the remaining claim.

SIGNED on March 23, 2007, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

57